# EXHIBIT A

## PATENT SALE ORDER

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DDMG Estate, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 12-12568 (BLS)<br><br>(Jointly Administered)<br><br>**Related Docket Nos. 290 and 291** |

## ORDER (I) APPROVING SALE OF IN THREE PATENTS AND RELATED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, AND (II) GRANTING RELATED RELIEF

THIS MATTER is before the Court on the motion [Docket No. 291] (the "Sale Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to sections 363(b) and 365 of Title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of the Bankruptcy Court; approving the *Purchase and Sale Agreement* (the "Agreement"), substantially in the form attached hereto as **Exhibit A**, by and between DDMG Estate (f/k/a Digital Domain Media Group, Inc.) and DDSGI Estate (f/k/a Digital Domain Stereo Group, Inc.) (together, the "Sellers") on the one hand, and RealD Inc., a Delaware corporation ("RealD"), either directly or through a special-purpose entity controlled by RealD to be created prior to the Closing (either RealD or such RealD-controlled entity, as the case may be, the "Successful Bidder"), on the

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal or foreign taxpayer identification number, if any, are as follows: D2 Software, Inc. (5602); DDH Land Holdings, LLC; DDH Land Holdings II, LLC; DD Estate (8392); DDI Estate (6275); DDInt Estate. (9344); DDMG Estate (9505); DDPI Estate (5757); DDPVC Estate (6450); DDSG Estate (4526); DDT Estate (6809); DDMI Estate (2113); Tradition Studios, Inc. (4883); Tembo Productions, Inc. (7634). The Debtors' mailing address is 10250 SW Village Parkway, Port St. Lucie, Florida 34987.

[2] Unless otherwise noted, capitalized terms used herein shall have the meanings set forth in the Sale Motion.

other hand, pursuant to which Sellers have agreed to the sale (the "Sale") to the Successful

Bidder of all of the Sellers' right, title and interests in the patent, trademark and copyright assets

identified in Schedules 1.1, 1.2, and 1.3 of the Agreement as well as the related rights, interests,

and other assets described in Section 1.1 of the Agreement, all as more fully set forth in the

Agreement (all such assets, collectively, the "Assets"), free and clear of liens, clams, interests,

and encumbrances (including, without limitation, the DIP Liens as defined in the *Final Order (I)*

*Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting*

*Adequate Protection, (III) Scheduling Final Hearing, and (IV) Granting Certain Related Relief*

[Docket No. 471] (the "Final DIP Order")), except for

> (A) the limited encumbrances described in Schedule 2.2 of the Agreement (the
> "Assumed Liabilities"), and
>
> (B) obligations under that certain Patent License Agreement dated September
> 24, 2012 by and between Sellers, as licensors, and Galloping Horse America
> LLC, as licensee (the "GH License Agreement"), to be assumed by Buyer as
> more particularly provided in the Agreement; and

The Agreement providing that the Successful Bidder will purchase the Assets for

valuable consideration, including payment of the Purchase Price in cash as provided therein; and

The Sale Motion having been served upon (i) the Office of the United States

Trustee; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to the

Debtors' prepetition and postpetition secured lenders; (iv) all other known parties asserting a lien

against the Debtors' assets; and (v) all parties that have filed notices of appearance and requests

for notices in the Debtors' chapter 11 cases, and the *Notice of Auction and Sale Hearing* [Docket

No. 489] having been served on all known creditors of the Debtors; and

Notice of the Sale Motion having been provided in accordance with the Court's *Order (A) Approving Procedures for Separate Sales of the Debtors' Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief*, signed on November 7, 2012 [Docket No. 480] (the "Bid Procedures Order"); and

The Successful Bidder having been designated as such pursuant to an auction conducted by the Debtors on December 14, 2012 in accordance with the Bid Procedures Order, and the terms of the Agreement having been accepted by the Debtors at such auction, all subject to Court approval at the Sale Hearing (defined below); and

It further appearing that the legal and factual bases set forth in the Sale Motion and at the hearing thereon which took place on December 17, 2012 (the "Sale Hearing") establish just cause for the relief granted herein; and after due deliberation thereon,

**NOW, THEREFORE, THE COURT HEREBY FINDS THAT:**

**A.    JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES**

1.    This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. § 1334.  This proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, the Court finds that there is no just reason for delay in the implementation of this Order, and directs entry of judgment as set forth herein.

3.      This proceeding is a "core proceeding" within the meaning of 28 U.S.C.
§ 157(b)(2)(A), (N) and (O).

4.      The Sale constitutes a sale of property of the estate outside the ordinary
course of business within the meaning of section 363(b) of the Bankruptcy Code.

## B.      GOOD FAITH OF SUCCESSFUL BIDDER

5.      The Successful Bidder is purchasing the Assets in good faith and is a good
faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore
entitled to the protection of that provision, and otherwise has proceeded in good faith in all
respects in connection with this proceeding in that: (a) the Successful Bidder recognized that the
Sellers were free to deal with any other party interested in acquiring the Assets; (b) the
Successful Bidder complied with the provisions in the Bid Procedures Order; (c) all payments to
be made by the Successful Bidder and other agreements or arrangements entered into by the
Successful Bidder in connection with the Sale have been disclosed; (d) the Successful Bidder has
not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (e) the
negotiation and execution of the Agreement and any other agreements or instruments related
thereto was in good faith.

## C.      HIGHEST AND BEST OFFER

6.      The Sellers conducted an Auction with respect to the Assets in accordance
with, and have otherwise complied in all respects with, the Bid Procedures Order. The Bid
Procedures and Auction for the Assets afforded a full, fair, and reasonable opportunity for any
person or entity to make a higher or otherwise better offer to purchase the Assets. The Auction
was duly noticed and conducted in a noncollusive, fair, and good faith manner and a reasonable

opportunity has been given to any interested party to make a higher and better offer for the Assets.

7.      The Agreement constitutes the highest and best offer for the Assets, and will provide a greater recovery for the Sellers' estates than would be provided by any other available alternative.  The Sellers' determination that the terms of the Agreement constitute the highest and best offer for the Assets constitutes a valid and sound exercise of the Sellers' business judgment.

8.      At the conclusion of the Auction, the Debtors selected Acacia Research Group, LLC as the Backup Bidder on the terms set forth in its Backup Bid.

9.      The Agreement represents a fair and reasonable offer to purchase the Assets under the circumstances of the Sellers' chapter 11 cases.  No other person or entity or group of entities has offered to purchase the Assets for greater economic value to the Sellers' estates than the Successful Bidder.

10.      Approval of the Sale Motion and the Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

11.      The Sellers have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Assets

12.      The consideration provided by the Successful Bidder pursuant to the Agreement constitutes reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

13.     Upon entry of this Order, the Sellers have full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, and no further consents or approvals are required for the Sellers to consummate the transactions contemplated by the Agreement.

## D.     SUCCESSFUL BIDDER IS NOT A MERE CONTINUATION OF THE SELLERS

14.     The Successful Bidder is not a mere continuation of the Sellers, there is not substantial continuity between the Successful Bidder and the Sellers, and there is no continuity of enterprise between the Sellers and the Successful Bidder.

15.     No common identity of incorporators, directors, or stockholders exists between the Successful Bidder and the Sellers.

16.     The Sale is not being entered into fraudulently.   The Sale has been properly noticed.

17.     The Successful Bidder is not holding itself out to the public as a continuation of the Sellers.

## E.     SUCCESSOR LIABILITY

18.     The Successful Bidder does not constitute a successor to the Sellers or their estates.

19.     The Sale does not amount to a consolidation, merger or *de facto* merger of the Successful Bidder and the Sellers.

## F.     SECTION 363 SALE

20.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore the Debtors may sell the Assets free and clear of any interest in such property, except as otherwise provided in the Agreement or in this Order.

6

21.     Except to the extent otherwise provided in paragraphs 42-47 of this Order, with respect to any and all entities and persons asserting any options, pledges, security interests, claims, equities, reservations, third party rights, replacement liens, superpriority claims, voting trusts or similar arrangements, liens, charges, licenses or other claims of ownership, or other encumbrances or restrictions on or conditions to transfer or assignment of any kind (including, without limitation, restrictions or conditions on or to the transfer, assignment or renewal of licenses, permits registrations and authorizations or approvals of or with respect to governmental units and instrumentalities), whether direct or indirect, absolute or contingent, matured or unmatured, liquidated or unliquidated on or against the Assets or the Debtors (collectively, the "Encumbrances"), except as otherwise provided in Schedule 2.2 of the Agreement with respect to the Assumed Liabilities or to the extent of any such rights that Walt Disney Studios Motion Pictures Production or its affiliates (the "Disney Entities") may establish on appeal or remand (such Disney Entities' rights, if any, the "Additional Disney Rights"), either (i) such person or entity has consented to the sale and transfer, license and assignment, as applicable, free and clear of its Encumbrances, with such Encumbrances, including, without limitation, the DIP Liens as defined in the Final DIP Order, to attach to the proceeds of such sale and transfer, license and assignment, as applicable, respectively, (ii) applicable nonbankruptcy law permits sale of the Assets free and clear of such Encumbrance, (iii) such Encumbrance is in *bona fide* dispute, or (iv) such person or entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Encumbrance.

22.     The Successful Bidder would not have entered into the Agreement and would not consummate the transactions contemplated thereby if the sale of the Assets to the Successful Bidder or (to the extent permitted by the Agreement) its respective assignees, and the

assumption of the Assumed Liabilities by the Successful Bidder or (to the extent permitted by the Agreement) its respective assignees were not, except as otherwise provided in the Agreement or as otherwise set forth herein and subject to the Assumed Liabilities, free and clear of all Encumbrances of any kind or nature whatsoever, or if the Successful Bidder would, or in the future could (except as provided in the Agreement or any amendments and subject to the Assumed Liabilities), be liable for any of such Encumbrances or other future liabilities arising out of past conduct of the Debtors or their past ownership of the Assets.

23.     The Successful Bidder is not purchasing all of the Debtors' assets. The Successful Bidder is only purchasing the Assets and is not purchasing any assets other than the Assets, to the extent set forth in the Agreement. With this Order, any Encumbrances shall attach solely to the proceeds of the Sale with the same extent, validity, force, priority, and effect as they attached to the Assets immediately prior to the Closing, subject to, and in accordance with, the Final DIP Order.

24.     The Successful Bidder is assuming the Assumed Liabilities only to the extent of the Encumbrances on the Assets described in Schedule 2.2 of the Agreement, and is not assuming any obligations other than the Assumed Liabilities or beyond the extent of those Encumbrances, except to the extent of any Additional Disney Rights.

25.     Given all of the circumstances of the Debtors' chapter 11 cases and the adequacy and fair value of the purchase price under the Agreement, the proposed sale of the Assets to the Successful Bidder constitutes a reasonable and sound exercise of the Sellers' business judgment and should be approved.

## G.  MISCELLANEOUS

26.    All findings of fact and conclusions of law announced by the Court at the Sale Hearing are hereby incorporated herein, including, without limitation, the Court's findings with respect to the Successful Bidder's good faith.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

27.    All objections to the Sale Motion or the relief requested therein with respect to the Assets that have not been withdrawn, waived, or settled as set forth herein, as announced to the Court at the hearing on the Sale Motion or by stipulation filed with the Court, and all reservations of rights included therein, or otherwise, are hereby overruled on the merits or the interests of such objections have been otherwise satisfied or adequately provided for, except as otherwise provided in paragraphs 42-47 of this Order.

28.    The Agreement and all other documents attached as exhibits thereto (substantially in the form thereof) are hereby approved in all respects, and shall be deemed in full force and effect, binding and benefiting the Sellers and the Successful Bidder.

29.    The Sellers are authorized and empowered to execute and deliver to the Successful Bidder the Agreement and any other agreements or documents contemplated thereby, and to implement and consummate all of the transactions and perform all obligations contemplated by the Agreement, including, without limitation, to sell the Assets to the Successful Bidder, all on the terms of the Agreement and this Order, for the purchase price set forth therein, and determined in accordance with the Agreement. The Sellers are authorized and empowered to deliver deeds, bills of sale, patent assignments, trademark assignments, copyright assignments, other assignments and other such instruments and/or documentation that may be

necessary or requested by the Successful Bidder in accordance with the terms of the Agreement to evidence the transfers required or otherwise contemplated by the Agreement.

30.     Upon the closing of the Sale (the "Closing"), the Successful Bidder shall take title to and possession of the Assets in accordance with and subject to the Agreement. Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtors are directed and authorized to transfer the Assets to the Successful Bidder on the Closing Date in accordance with the Agreement.  Pursuant to section 363(f) of the Bankruptcy Code and the Agreement, including any amendments thereto, with the exception of the Assumed Liabilities (defined above) and to the extent of any Additional Disney Rights or as otherwise provided in paragraphs 42-47 of this Order, the transfer of title to the Assets shall be free and clear of all interests and free of all Encumbrances,  with any such Encumbrances attaching to the proceeds from the Sale to the same extent and with the same validity as may have existed immediately prior to the Sale, subject to, and in accordance with, the Final DIP Order.

31.     Pursuant to the Final DIP Order and immediately upon the Closing, the Debtors shall distribute the proceeds of the Sale to the Initial Senior Noteholders and the DIP Lenders, as such terms are defined in the Final DIP Order in the manner as set forth in paragraph 34 of the Final DIP Order.

32.     Except as otherwise expressly set forth in the Agreement: (i) the Successful Bidder is not expressly or impliedly agreeing to assume any of the Sellers' liabilities; (ii) the transactions contemplated by the Agreement do not amount to a consolidation, merger, or a *de facto* merger of the Sellers and any Successful Bidder; (iii) the Successful Bidder is not a mere continuation of the Sellers nor does the Successful Bidder constitute a successor to the

Sellers; and (iv) the transactions contemplated by the Agreement are not being entered into fraudulently or in order to escape liability from the Sellers' debts.

33.     This Order shall be binding in all respects upon the Successful Bidder and its respective successors and assigns, the Sellers, their estates and any successors or assigns, all creditors of, and holders of equity interests in, the Sellers (whether known or unknown), any holders of Encumbrances on the Assets, all owners of easements, restrictive covenants, leases, contracts and licenses encumbering property owned by the Sellers, the Sellers and their affiliates and subsidiaries (and each of their respective successors and assigns), the Assets and any trustees, if any, subsequently appointed in the Sellers' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Sellers' cases. This Order and the Agreement shall inure to the benefit of the Sellers, their estates, their creditors, the Successful Bidder, and their respective successors and assigns.

34.     Except for the Assumed Liabilities (only to the limited extent set forth in Schedule 2.2 of the Agreement), the GH License Agreement, or to the extent of any Additional Disney Rights or as otherwise provided in paragraphs 42-47 of this Order, the Successful Bidder shall not have any liability or responsibility for any liability or other obligation of any of the Sellers arising under or related to the Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Agreement, the Successful Bidder shall not be liable for any claims against the Debtors or any of its predecessors or affiliates, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Sellers or any obligations of the Sellers arising prior to the Closing, whether relating to or arising out of the business of the Sellers, the Assets or

11

otherwise, other than the Assumed Liabilities (only to the limited extent set forth in Schedule 2.2 of the Agreement) or the GH License Agreement.

35.     Notwithstanding anything to the contrary herein, all parties to the GH License Agreement, and any and all other parties to any other agreement relating to the Assets (including, but not limited to, the license agreements identified on Schedule 2.2 to the Agreement) are forever barred and enjoined from raising or asserting against Successful Bidder any default, breach, claim, or pecuniary loss, arising under or related to such agreement existing as of the Closing or arising by reason of the Closing, except for any post-Sale breach by Successful Bidder or of any obligations that are Assumed Liabilities being assumed by the Successful Bidder under the Agreement.

36.     The Successful Bidder is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

37.     For purposes of calculating the period of any stay of this Order under applicable law, including under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, this Order shall be deemed entered on December ~~17~~ 21, 2012. ~~With the foregoing sentence the Disney Entities' oral motion for stay pending appeal made at the December 17th Hearing (as defined below) is hereby overruled.~~

38.     This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to

12

accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

39.     This Order constitutes authorization under all applicable jurisdictions and versions of the Uniform Commercial Code for the Successful Bidder to file UCC termination statements and termination of lien filings with the U.S. Patent & Trademark Office and Copyright Office with respect to all security or other interests in or liens on the Assets that are being released pursuant to, or otherwise in accordance with, this Order and the Final DIP Order.

40.     The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

**Objections**

41.     Any objections, challenges, defenses or claims of the Debtors (all of which shall, upon consummation of the Sale, expressly accrue to the Successful Bidder to assert), the Successful Bidder (pursuant to the Agreement or otherwise), or any other third party in the Assets are expressly preserved.

**The Court's Adjudication of the Disney Objection**

42.     On November 21, 2012, the Disney Entities filed their Limited Objection and Reservation of Rights of the Disney Entities of Debtors' Motion for Order (I) Approving Separate Sales of Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III)

13

Granting Related Relief (the "Disney Objection") [Docket No. 519].  The Disney Objection is overruled as set forth in this Court's letter ruling dated December 10, 2012 [Docket No. 658] (the "Disney Letter Ruling"), to the extent supplemented on the record of the hearing that took place on December 17, 2012 (the "December 17th Hearing").  The Disney Letter Ruling and oral rulings made on the record at the December 17th Hearing are hereby incorporated by reference to this Order.  Except as expressly provided in the Disney Letter Ruling, any and all defenses or claims of the Debtors (all of which shall, upon consummation of the Sale, expressly accrue to the Successful Bidder to assert), of the Successful Bidder (if any), or of any other third party in connection with any actual or asserted Disney Entities' rights or interests in or to the Assets are expressly preserved.  Any objections to the Sale Motion filed by the Disney Entities are overruled as set forth in the Disney Letter Ruling and at the December 17th Hearing.

43.    The Sellers shall cooperate with and provide reasonable assistance to the Successful Bidder in connection with the defense of any litigation or appeal brought by the Disney Entities relating to any of the Disney Entities' asserted rights to or interests in the Assets with no obligation on any of the Senior Lenders (as defined in the Final DIP Order) to provide any funds to the Sellers or permit use of Cash Collateral (as defined in the Final DIP Order) for any such cooperation or assistance.  The Debtors shall not be required to expend any funds or otherwise incur any out-of-pocket costs in connection with obligations set forth in this paragraph.

### Resolution of Marvel Objection

44.    Nothing in this Order shall be deemed to cut off, subordinate or otherwise impair the rights and or interests, if any, of Marvel Entertainment, LLC and its affiliates (collectively, the "Marvel Entities") arising under each of the: (a) *Special Visual Effects Agreement* dated as of March 30, 2012 (the "Iron Man Agreement"); (b) *Special Visual Effects*

14

*Agreement* dated as of December 4, 2009 (the "Thor Agreement"); and (c) *Special Visual Effects Agreement* dated as of October 25, 2011 (the "Avengers Agreement," and, collectively with the Iron Man Agreement and Thor Agreement, the "Marvel Agreements"). Notwithstanding the foregoing, any and all defenses or claims of the Debtors (all of which shall, upon consummation of the Sale, expressly accrue to the Successful Bidder to assert), of the Successful Bidder (if any), or of any other third party in connection with the Marvel Agreements, or in connection with any other actual or asserted Marvel Entities' rights or interests in or to the Assets are expressly preserved. With the foregoing sentences, any objections to the Sale Motion filed by the Marvel Entities are deemed resolved.

### Resolution of Prime Focus Objection

45.      Nothing in this Order shall be deemed to cut off, subordinate or otherwise impair the rights of the Prime Focus Parties arising from or in connection with the *Patent License and Settlement Agreement* dated July 17, 2012 (the "Prime Focus Agreement"), and the sale of U.S. Patent No. 6,208,348, entitled "System and Method for Converting Two-Dimensional Images Into Three-Dimensional Images" which issued March 27, 2001 (the "'348 Patent"), U.S. Patent No. 6,686,926, entitled "Image Processing System And Method For Converting Two-Dimensional Images Into Three-Dimensional Images," which issued February 3, 2004 (the "'926 Patent"), U.S. Patent No. 6,515,659, entitled "Method And System For Creating Realistic Smooth Three-Dimensional Depth Contours From Two-Dimensional Images," which issued February 4, 2003 (the "'659 Patent"), U.S. Patent No. 7,102,633, entitled "Method For Conforming Objects To A Common Depth Perspective For Converting Two-Dimensional Images Into Three-Dimensional Images," which issued September 5, 2006 (the "'633 Patent"), U.S. Patent No. 7,116,323, entitled "Method Of Hidden Surface Reconstruction For Creating

15

Accurate Three-Dimensional Images Converted From Two-Dimensional Images," which issued October 3, 2006 (the "'323 Patent"), or U.S. Patent No. 7,116,324, entitled "Method For Minimizing Visual Artifacts Converting Two-Dimensional Motion Pictures Into Three-Dimensional Motion Pictures," which issued October 3, 2006 (the "'324 Patent") (the '348 Patent, the '926 Patent, the '659 Patent, the '633 Patent, the '323 Patent, and the '324 Patent are collectively referred to as the "Asserted Digital Domain Patents"); and any and all related patent applications shall be subject to the respective rights and licenses of the Prime Focus Parties granted under the Asserted Digital Domain Patents under the Prime Focus Agreement. Notwithstanding the foregoing, any and all defenses or claims of the Debtors (all of which shall, upon consummation of the Sale, expressly accrue to the Successful Bidder to assert), of the Successful Bidder (pursuant to the Agreement or otherwise), or of any other third party relating to the Prime Focus Agreement or the respective rights and licenses of the Prime Focus Parties granted under the Prime Focus Agreement are expressly preserved.   With the foregoing sentences, any objections to the Sale Motion filed by the Prime Focus Parties are deemed resolved.

### Resolution of Lucasfilm Objection

46.     Nothing in this Order shall affect any right of Lucasfilm (if any), to assert a right or interest in the In Three Patents relating to work performed by Lucasfilm on the conversion of the movie "The Nightmare Before Christmas" ("NBC") from a two-dimensional movie to a three-dimensional movie arising under the *Confidentiality and Cooperation Agreement* dated May 1, 2006 (such Lucasfilm rights and interests, if any, the "Lucasfilm Rights") and the Sale of the In Three Patents shall be subject to such rights or interests (if any). Notwithstanding the foregoing, any and all defenses or claims of the Debtors (all of which shall,

upon consummation of the Sale, expressly accrue to the Successful Bidder to assert), of the Successful Bidder (pursuant to the Agreement or otherwise), or of any other third party in connection with the Lucasfilm Rights to any other right or interest in the Assets asserted by Lucasfilm are expressly preserved. With the foregoing sentences, any objections to the Sale Motion filed by Lucasfilm are deemed resolved.

### Resolution of Samsung Objection

47.     Nothing in this Order shall be deemed to cut off, subordinate or otherwise impair the rights and or interests, if any, of Samsung arising from or in connection with the *Patent License Agreement* dated November 1, 2011 (the "Samsung Agreement"), including without limitation rights provided by section 365(n) of the Bankruptcy Code (if any and whether exercised prior to or after entry of this Order) and other applicable law and the sale of the In Three Patents shall be subject to the respective rights and interests (if any) of Samsung in the In Three Patents under the Samsung Agreement (such Samsung rights and interest, if any, the "Samsung Rights"). Notwithstanding the foregoing, any and all defenses or claims of the Debtors (all of which shall, upon consummation of the Sale, expressly accrue to the Successful Bidder to assert), of the Successful Bidder (pursuant to the Agreement or otherwise), or of any other third party in connection with the Samsung Rights or of any other third party in connection with the Samsung Rights are expressly preserved. With the foregoing sentences, any objections to the Sale Motion filed by Samsung are deemed resolved.

48.     This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all modifications thereto and any waivers and consents thereunder, and each of the agreements executed in connection therewith to which and of the Debtors is a party or which has been

17

assigned by any Seller to the Successful Bidder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

   49. To the extent that any provisions of this Order are inconsistent with the provisions in the Agreement or any related instrument or document, any prior order, or any pleading with respect to the motions in this case, the terms of this Order shall control.

Dated: December 21, 2012

HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

DOCS_SF:82057.10

## EXHIBIT B

## DISNEY LETTER RULING

# United States Bankruptcy Court
## District of Delaware
824 N. Market Street
Wilmington, DE 19801

JUDGE BRENDAN LINEHAN SHANNON

824 MARKET STREET
WILMINGTON, DE 19801
(302) 252-2915

December 10, 2012

Robert J. Feinstein
Pachulski, Stang, Ziehl & Jones, LLP
780 Third Avenue, 36th Floor
New York, NY 10017-2024

Lisa H. Fenning
Arnold & Porter LLPO
777 South Figueroa St., 44th Floor
Los Angeles, CA 90017

Timothy P. Cairns
Pachulski, Stang, Ziehl & Jones, LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801

Theresa V. Brown-Edwards
Potter Anderson & Corroon LLP
1313 North market Street, 6th Floor
Wilmington, DE 19801

Re:    In re DDMG Estate, Case No. 12-12568 (BLS);
       Disney's Limited Objection [Docket No. 519] to Debtor's Motion for
       Order Approving Sale of Assets [Docket No. 291]

Dear Counsel:

On December 4, 2012, the Court held a hearing to resolve a dispute in connection with the Debtor's Motion for Order (I) Approving Separate Sales of Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief (the "Sale Motion"),[1] and the Limited Objection and Reservation of Rights of the Disney Entities to the Debtor's Sale Motion (the "Limited Objection").[2] This letter constitutes the Court's ruling on Disney's Limited Objection to the Debtor's Sale Motion.[3] The Court proceeds by way of letter ruling, rather than by formal memorandum opinion, because of the Debtor's stated urgency in needing a ruling prior to a planned auction. For the reasons that follow, the Court will overrule the Limited Objection.

---

[1] Filed 10/16/12, Case No. 12-12568, Docket No. 291.

[2] Filed 11/21/12, Case No. 12-12568, Docket No. 519.

[3] Consideration and disposition of the Limited Objection is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

The relevant facts are not in dispute.[4]  Prior to the Debtor's bankruptcy filing, Disney entered into two separate agreements with In Three, Inc. ("In Three") for three-dimensional ("3D") conversion services relating to two films.  First, on April 18, 2008, Disney and In Three entered into an agreement to use In Three Patents in connection with the film *G-Force* (the "G-Force Agreement").  Second, on August 14, 2009, Disney and In Three entered into another agreement to use the In Three Patents in connection with the film *Alice in Wonderland* (the "Alice in Wonderland Agreement").

On November 22, 2010, well after execution of the above agreements and completion of the two films, the Debtor and In Three entered into an Asset Purchaser Agreement ("APA") whereby the Debtor acquired In Three's patents in its 3-D conversion technology (the "In Three Patents").  It is undisputed that the Debtor did not assume or take by assignment the G-Force Agreement when it acquired the In Three Patents through the APA.  The Debtor now moves the Court for an order approving sale of certain assets, including the In Three Patents, free and clear of all liens, claims, encumbrances, and other interests; however, Disney asserts a continuing interest in the In Three Patents.

This dispute presents a long and complex history through a number of agreements and transactions; on top of that, the intersection of patent law and bankruptcy law is often murky.  Nevertheless, the crux of the dispute can be stated quite simply: does the G-Force Agreement operate to grant Disney a right to use the In Three Patents on a going forward basis?  And to put a finer point on it, for purposes of the Debtor's Sale Motion, will whoever buys the In Three Patents from the Debtor be required to permit Disney to use that technology, gratis, in perpetuity?  The answer to both of these questions is no.

The G-Force Agreement provided Disney with a limited license to use the In Three Patents in its film *G-Force*.[5]  Section 7(b) of the G-Force Agreement states that the "Company hereby grants to Producer...a perpetual, irrevocable, full paid-up, royalty-free, worldwide right and license to reproduce, distribute, display, perform, modify and otherwise use and exploit...[the patents] in connection with displaying, developing, enhancing, marketing, distributing or providing, maintaining, supporting, or otherwise using or exploiting [the film G-Force]."  The G-Force Agreement also provided a Covenant Not to Sue ("CNTS").  Specifically, Section 16(a) of the G-Force Agreement states that the "Company and its affiliates agree that they will not pursue any claim or cause of action or otherwise assert any Company IP against Producer...based on work for [Producer] by a third party vendor."[6]  It goes on to state that "[s]uch agreement does not restrict Company's right to pursue a claim or cause of action against a third party for services performed by such third party for [Disney]...."  The centerpiece of the Limited Objection rests with the provisions of the G-Force Agreement relating to an option for a broad, forward-looking license for Disney (as distinct from the limited license—restricted to the film *G-Force*—provided for in Section 7(b)).  Section 16(b) states that Disney:

> may, in its sole discretion, request from Company a license under the Company IP.

---

[4]The Court presumes familiarity with the general background of these Chapter 11 proceedings.

[5]The G-Force Agreement refers to Acceleration Productions, Inc., which for our purposes is Disney, as the "Producer" and refers to In Three, Inc. as the "Company."

[6]"Company IP" is the In Three Patents at issue and is defined in Section 16(c) of the G-Force Agreement as "patents and patent applications owned, controlled, or acquired by Company or its Affiliates as of the effective date of this Agreement or at any time in the future that relate to or are otherwise associated with the creation, capture, development, distribution, editing, production or display of a motion picture, television show, animation, or other entertainment image or depiction of any kind or nature, in any form of medium."

Within thirty (30) days of receiving such request, Company shall grant to such entity a non-exclusive, transferable (but only to an Affiliate), non-sublicensable, irrevocable, perpetual, worldwide license to make, have made, use, sell, offer for sale, and import any product and perform any method under the Company IP at a fee to be negotiated by the parties in good faith in accordance with then-current industry standards, provided that such fee shall not exceed the lowest license fee provided by Company to any third party....[I]n the event that Company seeks to sell, assign or otherwise transfer any of the Company IP, or its interest in any of the Company IP, to a third party, Company shall provide prompt written notice to Producer not less than sixty (60) days prior to the completion of such sale, assignment, or transfer, and Producer or its Affiliates may thereafter obtain a license under the same terms set forth herein.

Finally, Section 16(d) states that "Paragraph 16 shall survive the expiration or termination of this Agreement." The record reflects that the option contained in Section 16(b) of the G-Force Agreement was never exercised. It is undisputed that negotiations occurred between the Debtor and Disney regarding a broader license, but it is equally clear that no final agreement was ever reached or executed.

### Disney's Limited Licenses

The parties agreed at the hearing that Disney enjoys a limited license related to the In Three Patents as it pertains to the specified completed films.[7] These limited licenses are contained in Section 7(b) of the G-Force Agreement and Section 6(b) of the Alice in Wonderland Agreement and the limited licenses relate solely to those specific films. The Court holds that Disney may preserve its limited licenses to use the In Three Patents as they pertain to these specific films.

### Section 16(b) - Disney's Option

Disney alleges that its prepetition request to the Debtor for a license established a grant of that license, on a perpetual royalty-free basis.[8] Disney focuses on the specific language of the G-Force Agreement that purports to grant in Disney a general license within thirty days of making its request. Disney alleges that by requesting a license from the Debtor, it has satisfied the Section 16 option, and therefore enjoys the license irrespective of whether it was ever documented. However, this argument ignores the nature of a contractual option. First, the G-Force Agreement was a contract entered into by Disney and In Three. It is undisputed that neither the Debtor nor any of the Debtor's affiliates were a party to the contract. It is also undisputed that when the Debtor purchased the In Three Patents via the APA, the Debtor did not assume or take by assignment the G-Force Agreement.[9] Thus, there is no contractual privity between Disney and the Debtor that would enable Disney to enforce the G-Force Agreement

---

[7] The Court is aware of Disney's limited licenses to use the In Three Patents in the films *G-Force* and *Alice in Wonderland*. It appears that an agreement between the Debtor and Disney in connection with the film *TRON* utilized the Debtor's services for visual effects, but did not involve any services relating to the In Three Patents.

[8] Disney states that, pursuant to Section 16(b) of the G-Force Agreement, all that was required of them was to request a license and In Three "shall grant" the license within thirty days. Therefore, they allege that the mere request for a license effectuated its granting in them the license. Section 16 further provides that the fee is to be negotiated in good faith by the parties and shall not exceed the lowest license fee provided by In Three. Since In Three purportedly gave a license away for free, Disney alleges that it is entitled to a license on a royalty-free basis.

[9] The Court also notes that Section 10 of the G-Force Agreement specifically states that the "Agreement and Company's rights and obligations hereunder may not be assigned by Company."

against the Debtor.[10]

Disney cites *Spansion* for the proposition that "no special language is required to create a patent license" and that "the parties entered into a valid contract by exchanging promises to act or refrain from acting." *In re Spansion Inc.*, 2011 WL 3268084, at *7. Disney alleges that once the request upon the Debtor was made, the contract for granting of a license to Disney in effect occurred. This reading is flawed because it is undisputed that Disney and the Debtor never exchanged "promises to act or refrain from acting." As previously stated, the G-Force Agreement was between Disney and In Three. The Court acknowledges that if Disney had requested and obtained a license from In Three, the In Three Patents likely would remain encumbered by or subject to that license. But that is not the case before the Court. Therefore, the Court holds that Disney did not obtain a general license in the In Three Patents merely by requesting it from the Debtor.

Disney argues that In Three could only transfer to the Debtor the patent rights that it had. The Court does not disagree. At the time of the APA, Disney had not exercised its option under the G-Force Agreement. Thus, at that point in time, In Three held patents that were not subject to an enforceable perpetual license in favor of Disney. It may be true that In Three neglected to give Disney the required notice of the proposed transaction with the Debtor; however, that is not the fault of the Debtor. Again, the Debtor was not a party to the G-Force Agreement and has no contractual privity with Disney whatsoever. Thus, when the APA was entered into, Disney had no right or license in the In Three Patents, except for the aforementioned limited licenses, and the Debtor did not purchase the In Three Patents subject to the G-Force Agreement or any right by Disney. Since the option was not exercised prior to the APA, Disney can not later demand to exercise its license option. *See In re Storm Tech., Inc.*, 260 B.R. 152, 154 (Bankr. N.D. Cal. 2001) ("Since the condition precedent to the inception of the license had not occurred prior to the petition date, Logitech does not have a license in the patents.").

Disney cites *In re Novon Int'l, Inc.* for the proposition that an assignee of a patent takes it subject to license rights in existing agreements.[11] In *Novon*, the court dealt with a Bankruptcy Court sale order that provided one party with a license option. *Novon Int'l, Inc. v. Envtl. Packaging, L.P. (In re Novon Int'l, Inc.)*, 98-CV-0677E(F), 2000 WL 432848, at *3 (W.D.N.Y. Mar. 31, 2000) (specifically analyzing Section 3(D) of the Bankruptcy Court sale order). The court wrote "to the extent that Novon had breached an obligation owed to EnPac or another licensee in connection with a license, such duty survived the sale." *Id.* at *10. This case is readily distinguishable because both parties in the dispute in *Novon* were involved in drafting the sale order. Here, the Debtor was not a party to the G-Force Agreement, was not involved in drafting it, and did not assume the Agreement. It is also distinguishable because the Debtor never breached any obligations owed to Disney because it had no contractual obligations to Disney.

Disney asserts that "an option is an irrevocable offer that the optionee can convert into a binding bilateral contract by acceptance of the offer, *i.e.*, exercise of the option." Disney's Limited Objection ¶ 24 (citing *Palo Alto Town & Country Vill., Inc. v. BBTC Co.*, 521 P.2d

---

[10]Indeed, the record here belies the assertion that Disney's right to a perpetual license survived or was exercised, as the parties' extended negotiations are acknowledged to have failed.

[11]Disney also cites *Wiav Solutions LLC v. Motorola, Inc.*, which is a case dealing with constitutional standing in patent licenses and does not directly implicate the rights of license options. 631 F.3d 1257 (Fed. Cir. 2010).

1097, 1102-03 (Cal. 1974) (holding that a tenant can accept an option at anytime and bind the landlord)). The Court accepts this general principle of contract law; however, it is inapplicable on these facts. Here, the option was between Disney and In Three. Although an option is an irrevocable offer, that option only binds the parties to the agreement. As stated multiple times, the Debtor was not a party to the G-Force Agreement and did not assume it. Therefore, Disney cannot now try to exercise an option that has since lapsed.

### Section 16(a) - Covenant Not To Sue

Many courts have held that a non-exclusive license is equivalent to a covenant not to sue. *See, e.g., Transcore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009). The Federal Circuit has held that a patent license is "nothing more than a promise by the licensor not to sue the licensee." *Spindelfabrik Suessen-Schur, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987). The Federal Circuit also stated that it is not whether an agreement is framed in terms of a "covenant not to sure" or a "license," but rather what the agreement authorizes. *Transcore*, 563 F.3d at 1276. Here, the CNTS protects Disney from lawsuits by In Three based on work for Disney by third party vendors. The CNTS does not protect Disney from a lawsuit by In Three against Disney for unauthorized use by Disney. Similarly, the CNTS does not protect third party vendors from lawsuits by In Three for unauthorized use of the In Three Patents. Therefore, the CNTS contained within the G-Force Agreement, which granted Disney a limited license to use the In Three Patents in connection with the film *G-Force*, is itself limited and only authorized a limited protection to Disney. *Spansion*, cited by Disney in support of their position that the CNTS grants them a general license in the In Three Patents, is distinguishable on these facts. Spansion broadly agreed not to sue Apple in order to remain one of Apple's suppliers (and continue to have its memory chips embedded or installed in Apple products) and therefore, the court found that a non-exclusive license was established. *Apple, Inc. v. Spansion Inc. (In re Spansion Inc.)*, 09-1069 KJC, 2011 WL 3268084, at *7 (D. Del. July 28, 2011). That case is distinguishable on these facts because the CNTS here pertains only to a limited license granted by In Three to Disney and the CNTS itself is limited, *i.e.*, Disney could still be sued by In Three. Therefore, the Court holds that Disney does not have a general license by way of the CNTS; however, the Court does find that the sale is subject to the CNTS rights for the two specified films.

### Section 365(n)

Finally, the parties disagree as to whether § 365(n) has any application to this dispute. Section 365(n) governs the rights of an intellectual property license in the event a debtor rejects such license. The Debtor contends that, because it is not rejecting any license, § 365(n) does not apply. Disney disagrees, and argues that a request to sell "free and clear" of an existing license or interest in intellectual property is tantamount to a rejection, and thus triggers the protections of § 365(n).

The Court need not reach this question of the applicability of § 365(n) to a sale under § 363(f). The parties stipulated at the hearing that Disney's rights in the In Three Patents as they

relate to *G-Force* and *Alice in Wonderland* will continue to be honored.[12]  As described above in detail, because Disney did not exercise its option, it does not possess any further rights in the In Three Patents and § 365(n) thus does not bear materially upon this dispute.

### *Conclusion*

It was incumbent upon Disney to obtain the license in accordance with Section 16(b) of the G-Force Agreement prior to any sale.  Because the Debtor did not assume the G-Force Agreement and, in the absence of contractual privity between the Debtor and Disney, the Debtor is not bound to honor the option rights under Section 16(b).  Disney's license rights in the In Three Patents are limited to the films identified above.  Accordingly, Disney's Limited Objection is overruled.

Very truly yours,

Brendan Linehan Shannon

BLS/ahs

---

[12]Considering the parties' arguments on this point in their supplemental letters [Docket Nos. 652 and 655], the Court does not agree that the stipulation as to existing rights for *G-Force* and *Alice in Wonderland* compels the conclusion that the CNTS constitutes a broad perpetual license.

**EXHIBIT C**

**NOTICE OF APPEAL**

**File an Appeal:**

12-12568-BLS DDMG Estate
Type: bk                    Chapter: 11 v            Office: 1 (Delaware)
Assets: y                   Judge: BLS
Case Flag: LEAD, MEGA, PlnDue, DsclsDue, CLMSAGNT, SealedDoc(s)

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Theresa Vesper Brown-Edwards entered on 12/28/2012 at 2:38 PM EST and filed on 12/28/2012
Case Name:        DDMG Estate
Case Number:      12-12568-BLS
Document Number: 736

Docket Text:
Notice of Appeal *of The Disney Entities from Order (I) Approving Sale of In Three Patents and Related Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, and (II) Granting Related Relief.* Fee Amount $298. (related document(s)[721]) Filed by Walt Disney Studios Motion Picture Production, Briar Rose Productions, Ltd. and Extinction Productions, Ltd.. Appellant Designation due by 01/11/2013. (Attachments: # (1) Exhibit A - Sale Order# (2) Exhibit B - Letter Ruling# (3) Certificate of Service) (Brown-Edwards, Theresa)

The following document(s) are associated with this transaction:

Document description: Main Document
Original filename: J:\ALLEGRETTIM\DisneyNotofAppeal.pdf
Electronic document Stamp:
[STAMP bkecfStamp_ID=983460418 [Date=12/28/2012] [FileNumber=11333154-
0] [158ec0baded24de376eb2f92d57c6285d8b226170996e3c9c17d7799fc97b49fa
1ff4b55facdbbcffc8d143102a6aa2125f272b868654a1e19d13cd810dcd25]]
Document description: Exhibit A - Sale Order
Original filename: DisneyNotofAppealExA-SaleOrder.pdf
Electronic document Stamp:
[STAMP bkecfStamp_ID=983460418 [Date=12/28/2012] [FileNumber=11333154-
1] [9afe3bccad62f3721d96d63b52df68e1b0034bb942f75fe075013484b61f0a8a3c
08d9ed6a0766ca4d501690ab81086fa6f9450e52961ccd4b6485a7a62cfc49]]
Document description: Exhibit B - Letter Ruling
Original filename: DisneyNotofAppealExB-LtrRuling.pdf
Electronic document Stamp:
[STAMP bkecfStamp_ID=983460418 [Date=12/28/2012] [FileNumber=11333154-
2] [862ea52da93a99d963a1a32ba6367bb5fe98043f089c5c75a0b7e4bbb18106c9a6
41116a7c49c13bf486ddae9f62273b3515c6d9d7eb05ff689a380d5b3340c2]]
Document description: Certificate of Service
Original filename: DisneyNotofAppealCOS.pdf
Electronic document Stamp:
[STAMP bkecfStamp_ID=983460418 [Date=12/28/2012] [FileNumber=11333154-
3] [0b1456212232981db97ccfb59e101ea7bd32af8bdacf97fbe1921f7774676a94c8
f8463ebab6d83d089d485a6d9f1961363db406c9a4171e175a011855180f6af]]

**12-12568-BLS Notice will be electronically mailed to:**

Josef S. Athanus on behalf of Interested Party Ender's Game Holdings LLC
chefiling@lw.com

Karen C Bifferato on behalf of Creditor James Bradshaw
kbifferato@connollygallagher.com

William Pierce Bowden on behalf of Creditor Technicolor Creative Services USA, Inc.
wbowden@ashby-geddes.com

Theresa Vesper Brown-Edwards on behalf of Interested Party Marvel Entertainment, LLC, Iron Works Productions III LLC, Iron Works Productions Canada III Inc. and MVL Film Finance LLC
bankruptcy@potteranderson.com

Michael G. Busenkell on behalf of Creditor Beijing Galloping Horse Media Co., Ltd., Beijing Galloping Horse Film & TV Co., Ltd. and Galloping Horse Film Co., Ltd.
mbusenkell@gsbblaw.com

Timothy P. Cairns on behalf of Debtor D2 Software, Inc.
tcairns@pszjlaw.com

Timothy P. Cairns on behalf of Debtor DDI Estate
tcairns@pszjlaw.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| **DDMG Estate, *et al.*,** | ) | Case No.:  12-12568 (BLS) |
|  | ) |  |
|  | ) | **Doc. Ref. No. 658, 721** |
| Debtors. | ) |  |
|  | ) |  |

## NOTICE OF APPEAL OF THE DISNEY ENTITIES FROM
## ORDER (I) APPROVING SALE OF IN THREE PATENTS AND RELATED
## ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
## AND OTHER INTERESTS, AND (II) GRANTING RELATED RELIEF

Pursuant to 28 U.S.C. § 158(a)(1) and Federal Rule of Bankruptcy Procedure 8001, Walt

Disney Studios Motion Picture Production and certain of its affiliates (collectively, the "**Disney**

**Entities**") hereby appeal to the United States District Court for the District of Delaware from the

Order (I) Approving Sale of In Three Patents and Related Assets Free and Clear of All Liens,

Claims, Encumbrances and Other Interests, and (II) Granting Related Relief [D.I. 721] the ("**Sale**

**Order**"), entered by the Bankruptcy Court on December 21, 2012 in the above-captioned cases.

A true and correct copy of the Sale Order is attached hereto as Exhibit A.  The Sale Order

incorporates by reference and implements an informal letter ruling [D.I. 658] the ("**Letter**

**Ruling**") in the nature of an opinion that was issued by the Bankruptcy Court on December 10,

2012.  A true and correct copy of the Letter Ruling is attached hereto as Exhibit B.

The names of all parties to the Sale Order appealed from and the names, addresses, and

telephone numbers of their respective attorneys are as follows:

| | |
|---|---|
| Appellant: | The Disney Entities, as defined herein. |
| Counsel for Appellant: | Theresa V. Brown-Edwards (DE Bar No.4225)<br>R. Stephen McNeill (DE Bar No. 5710)<br>Potter Anderson & Corroon LLP<br>Hercules Plaza<br>1313 North Market Street, 6th Floor<br>Wilmington, DE 19801<br>Telephone: (302) 984-6000 |

1

and

Lisa Hill Fenning (California SBN 89238)
Harry E. Garner (California SBN 254942)
Arnold & Porter LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: (213) 243-4000

Appellee:                          Debtors in the above-captioned cases

Counsel for Appellee:              Debra I. Grassgreen (CA Bar No. 169978)
                                   Robert J. Feinstein (NY Bar No. RF-2836)
                                   Timothy P. Cairns (DE Bar No. 4228)
                                   Pachulski Stang Ziehl & Jones LLP
                                   919 North Market Street, 17th Floor
                                   Wilmington, DE 19899-8705
                                   Telephone: (302) 652-4100

Appellee:                          RealD Inc., as Successful Bidder and Buyer

Counsel for Appellee:              Jeffrey M. Reisner
                                   Eric A. Webber
                                   Kerry A. Lyman
                                   Irell & Manella LLP
                                   840 Newport Center Drive, Suite 400
                                   Newport Beach, CA 92660-6324
                                   Telephone: (949) 760-0991

Appellee:                          DIP Lenders

Counsel for Appellee:              Adam G. Landis (DE Bar No. 3407)
                                   Kerri K. Mumford (DE Bar No. 4186)
                                   Jeffrey R. Drobish (DE Bar No. 5437)
                                   Landis Rath & Cobb LLP
                                   919 Market Street, Suite 1800
                                   Wilmington, DE 19801
                                   Telephone: (302) 467-4400

                                   and

                                   David M. Hillman
                                   Karen S. Park
                                   Neil S. Begley

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| **DDMG Estate**, *et al.*, | ) | Case No.: 12-12568 (BLS) |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |
|  | ) |  |

## <u>CERTIFICATE OF SERVICE</u>

I, Theresa V. Brown-Edwards, hereby certify that on this 28th day of December 2012, I

caused a true and correct copy of the foregoing **Notice of Appeal of The Disney Entities from**

**Order (I) Approving Sale of In Three Patents and Related Assets Free and Clear of All**

**Liens, Claims, Encumbrances and Other Interests, and (II) Granting Related Relief** to be

served upon the individuals listed below as indicated:

**Via E-Mail and Hand Delivery**
Timothy P. Cairns, Esquire
Pachulski, Stang, Ziehl & Jones, LLP
919 N Market Street, 17th Floor
Wilmington, DE  19801
tcairns@pszjlaw.com

**Via E-Mail and First-Class Mail**
Debra I. Grassgreen, Esquire
Pachulski, Stang, Ziehl & Jones, LLP
150 California Street, 15th Floor
San Francisco, CA  94111-4500
dgrassgreen@pszjlaw.com

**Via E-Mail and First-Class Mail**
Robert J. Feinstein, Esquire
Pachulski, Stang, Ziehl & Jones, LLP
780 Third Avenue, 36th Floor
New York, NY  10017-2024
rfeinstein@pszjlaw.com

**Via E-Mail and Hand Delivery**
Richard Schepacarter, Esquire
Office of the United States Trustee
844 King Street, Suite 2207
J. Caleb Boggs Federal Building
Wilmington, DE  19801
Richard.Schepacarter@usdoj.gov.

**Via E-Mail and First-Class Mail**
Adam Harris, Esquire
David Hillman, Esquire
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY  10022
adam.harris@srz.com
david.hillman@srz.com

**Via E-Mail and Hand Delivery**
Adam G. Landis, Esquire
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE  19801
landis@lrclaw.com

**Via E-Mail and First-Class Mail**
Jeffrey Schwartz, Esquire
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
jschwartz@brownrudnick.com

**Via E-Mail and Hand Delivery**
William D. Sullivan, Esquire
Sullivan Hazeltine Allinson LLC
901 Market Street, Suite 1300
Wilmington, DE 19801
bsullivan@sha-llc.com

**Via E-Mail and First-Class Mail**
Jeffrey M. Reisner, Esquire
Eric A. Webber, Esquire
Kerry A. Lyman, Esquire
Irell & Manella LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660-6324
jreisner@irell.com
ewebber@irell.com
klyman@irell.com

Under penalty of perjury, I declare the foregoing to be true and correct.

POTTER ANDERSON & CORROON LLP

_/s/ Theresa V. Brown-Edwards_
Theresa V. Brown-Edwards (DE Bar No.4225)
R. Stephen McNeill (DE Bar No. 5210)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000

-and-

ARNOLD & PORTER LLP
Lisa Hill Fenning (California SBN 89238)
Harry E. Garner (California SBN 254942)
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: (213) 243-4000

_Attorneys for The Disney Entities_

## EXHIBIT D

## DISNEY LIMITED OBJECTION TO PATENT SALE PROCEDURES

Docket #0369  Date Filed: 10/30/2012

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| **DDMG Estate, *et al.*,** | ) | Case No.: 12-12568 (BLS) |
|  | ) |  |
| Debtors. | ) | **Doc. Ref. Nos. 290 and 291** |
|  | ) |  |

## LIMITED OBJECTION AND RESERVATION OF RIGHTS OF THE DISNEY ENTITIES TO THE DEBTORS' MOTIONS TO APPROVE SALE PROCEDURES AND SEPARATE SALES OF ASSETS

Walt Disney Studios Motion Picture Production ("**Disney Studios**") and certain of its affiliates (the "**Disney Entities**") hereby object and reserve all of their rights and remedies (the "**Limited Objection**") to (1) Debtors' Motion for an Order (A) Approving Procedures for Separate Sales of Assets, (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Forms of Notice, and (D) Granting Related Relief [Docket No. 290] (the "**Sale Procedures Motion**"); and (2) Debtors' Motion for Order (I) Approving Separate Sales of Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief [Docket No. 291] (the "**Sale Motion**"). In support of this Limited Objection, the Disney Entities respectfully represent as follows:

## I.    BACKGROUND

1.      On September 11, 2012 (the "**Petition Date**"), Debtors filed their voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). Debtors thereafter sold substantially all of their California and Vancouver assets (the "**Asset Sale**") to Galloping Horse America, LLC (the "**Asset Buyer**") in accordance with an Asset Purchase Agreement between the Asset Buyer and Debtors, dated as of September 24, 2012. The Disney Entities filed a limited objection regarding certain agreements included in the

1212568121030000000000005

Asset Sale, which was resolved consensually with Debtors and the Asset Buyer. The Asset Sale closed on September 27, 2012, subject to a sale order that included protective language for the Disney Entities' rights under these agreements.

2.      Pursuant to the pending Sale Procedures Motion and Sale Motion, Debtors have now requested approval of sale procedures and authority to sell, among other things, the intellectual property assets originally held by In Three, Inc. ("**In Three**") (an entity acquired prepetition by Debtors) related to the conversion of two dimensional artwork to three dimensional artwork (the "**In Three Patents**") in a separate sale (the "**Patent Sale**") to a buyer who has not yet been identified (the "**Patent Buyer**").

3.      The Disney Entities are parties to a number of agreements with Debtors or In Three as their predecessor in interest that are potentially affected by the Patent Sale, including, but not limited to: (1) an agreement dated as of April 18, 2008 (the "**G-Force Agreement**") between Acceleration Productions, Inc. and In Three in connection with the *G-Force* motion picture; (2) an agreement dated as of August 14, 2009 (the "**Alice in Wonderland Agreement**") between Bandersnatch Productions, Inc. and In Three in connection with the *Alice in Wonderland* motion picture; and (3) certain agreements entered into in 2008 and 2009 between Grid Productions, Inc. and Digital Domain Productions, Inc. ("**DDP**") in connection with the *TRON: Legacy* motion picture (the "**TRON Agreements**," and collectively with the G-Force Agreement and the Alice in Wonderland Agreement, the "**Production Agreements**").[1] Pursuant to the Production Agreements, Debtors agreed to provide those certain visual special effects ("**VFX**") services requested by Disney for the motion pictures covered thereby (collectively, the "**Works**").

4.      The Production Agreements all grant non-exclusive, fully paid, royalty-free licenses to the Disney Entities to use all or any portion of the intellectual property of In Three or

---

[1] The Production Agreements all contain confidentiality clauses and certain confidential commercially sensitive information, and therefore are not attached to this Limited Objection. Debtors should already have copies of the Production Agreements, but the Disney Entities are willing to submit the Production Agreements under seal, at the appropriate time, if requested to do so.

DDP that has been incorporated into the Works, for the purpose of distributing, displaying, or otherwise exploiting the Works (collectively, the "**Limited Licenses**").  The Production Agreements also include substantially similar covenants by In Three or DDP not to challenge in any forum the Disney Entities' rights to exploit the Works and not to thwart, hinder, or subvert the Disney Entities' use of the Limited Licenses (collectively, the "covenant not to sue rights" or "**CNTS Rights**").

     5.     The G-Force Agreement includes an additional provision granting the Disney Entities the right to an unlimited, non-exclusive, perpetual worldwide license to use the In Three Patents in exchange for a fee to be negotiated between the parties in good faith on a most-favored-nation basis (the "**In Three Patent Rights**").  In Three or its successor was required to grant the license (the "**In Three Patent License**") within thirty days of a request by the Disney Entities for the In Three Patent License.  Section 16(b) of the G-Force Agreement provides:

> Producer or any of its Affiliates [the Disney Entities]… may, in its sole discretion, request from Company a license under the Company IP [the In Three Patents].  Within thirty (30) days of receiving such request, Company shall grant to such entity a non-exclusive, transferable (but only to an Affiliate), non-sublicensable, irrevocable, perpetual, worldwide license to make, have made, use, sell, offer for sale, and import any product and perform any method under the Company IP at a fee to be negotiated by the parties in good faith in accordance with then-current industry standards, provided that such fee shall not exceed the lowest license fee provided by Company to any third party. . . . [I]n the event that Company seeks to sell, assign or transfer any of the Company IP, or its interest in any of the Company IP to a third party, Company shall provide prompt written notice to Producer not less than sixty (60) days prior to the completion of such sale, assignment, or transfer, and Producer or its Affiliates may thereafter obtain a license under the same terms set forth herein.  Other than as stated herein, the foregoing shall not be deemed to restrict or prohibit Company from selling, assigning or otherwise transferring the Company IP.

The only material term of the In Three Patent License not specified in this provision was the amount of the royalty fee.  However, the requirement that "such fee shall not exceed the lowest license fee provided by Company to any third party" (the "most-favored-nation" or "**MFN Clause**") effectively established that missing term.  As other unlimited, non-exclusive, perpetual worldwide licenses in the In Three Patents have been granted to other parties on a <u>royalty-free</u>

basis (such as Prime Focus World and Industrial Light and Magic, as discussed in greater detail below), the Disney Entities were entitled to the In Three Patent License on the same royalty-free terms. Thus, the fee did not need to be negotiated; the In Three License was required to be royalty-free.

6.    As provided in Section 16(b), any sale or transfer of the In Three Patents remains subject to the Disney Entities' In Three Patent Rights and any In Three Patent License granted thereunder.

7.    Section 16(a) of the G-Force Agreement also includes CNTS Rights.

8.    Pursuant to Section 16(d), the Disney Entities' IP Patent Rights and CNTS Rights both expressly survive the expiration or termination of the G-Force Agreement. Pursuant to Section 19, the G-Force Agreement is binding upon In Three's successors and assignees.

9.    After DDP acquired In Three and the In Three Patents in November 2010, the Disney Entities decided that they wanted to exercise their In Three Patent Rights and receive the In Three Patent License to which they were entitled. Declaration of Robert Faulkner (the "**Faulkner Declaration**") ¶ 2, filed contemporaneously with this Limited Objection. Commencing in December 2011, in-house counsel at Disney Studios and DDP began discussions regarding DDP's obligation under the G-Force Agreement, as In Three's assignee, to grant the In Three Patent License. Faulkner Declaration ¶ 3. Even though the G-Force Agreement is binding by its express terms on any successor in interest, DDP took the position that it had purchased only In Three's assets, and disputed that it was bound by the licensing obligations and CNTS Rights provided in the G-Force Agreement. Id.

10.    To resolve this dispute, in January 2012, DDP's General Counsel acknowledged in a conversation with Disney Studios' Principal Counsel that, without conceding Disney's contention that DDP was obligated to do so, DDP intended to honor the "spirit" of the G-Force Agreement in granting the In Three Patent License and honoring the CNTS Rights. Faulkner Declaration ¶ 4. DDP also later acknowledged that it would grant Disney the In Three Patent License on a royalty-free basis, which would have been required anyway by operation of the

MFN Clause, under the circumstances.  Id.  However, DDP was only willing to end this dispute once Disney Studios agreed to discuss the possibility of retaining DDP for the VFX work on the motion picture *Maleficent*.  Id.  On this basis, the parties proceeded with further discussions regarding the agreement memorializing the In Three Patent License (the "**License Agreement**"), including negotiations between Paul Shurgot of Disney Studios and John Textor, then the CEO of DDP.  Id.  Ultimately, and notwithstanding the fact that it was not entitled to extract such additional consideration because the G-Force Agreement bound DDP to grant the In Three Patent License on a royalty-free basis, the Disney Entities paid DDP approximately $3.8 million prior to the Petition Date on account of the *Maleficent* project; *i.e.*, revenues resulting in large part from DDP's commitment to settle the dispute and grant the In Three Patent License.  Id.

11.     As the product of the negotiations between Disney and DDP, on May 18, 2012, Disney Studios sent a draft form of the License Agreement to DDP for review and comment. Faulkner Declaration ¶ 6; a true and correct copy of the May 18, 2012 email correspondence between Disney Studios and DDP is attached as Exhibit A to the Faulkner Declaration.  Taken together with the discussions and negotiations between the parties, the transmittal of the draft License Agreement was, at the latest, Disney Studios' formal request for the In Three License (the "**Request**").

12.     Prior to the Petition Date and after the *Maleficent* project was underway, Disney Studios and Debtors exchanged drafts and comments to memorialize the License Agreement, the substantive terms having already been specified by the G-Force Agreement in light of the effect of the MFN Clause.  Faulkner Declaration ¶ 7; Exhibit B.  The Disney Entities were informed and believed that Debtors had previously granted a non-exclusive, royalty free license in the In Three Patents to, among others, Prime Focus World, and that In Three had granted a royalty free license to Industrial Light and Magic.  Id.  Although all material terms were already established by operation of Section 16(b) of the G-Force Agreement, the License Agreement was not itself executed before the Petition Date.  Id.

13.    The Disney Entities contend that, notwithstanding DDP's failure to execute the License Agreement before filing this Case, the grant of the In Three Patent License was effective on the 31st day after the Request, namely, on June 19, 2012, almost three months before the Petition Date, as no particular form of documentation is required to effectuate a grant of a patent license under applicable nonbankruptcy patent law.  The Disney Entities do not oppose the proposed sale of the In Three Patents, provided that their Limited Licenses, the CNTS Rights, the In Three Patent License, and the In Three Patent Rights to continue to use the In Three Patents are preserved in the orders entered in connection with the Sale Procedures Motion and the Sale Motion.  The Disney Entities reserve all rights to submit a further response to the Sale Motion.

## II.    ARGUMENT

14.    Pursuant to Bankruptcy Code § 365(n), the Disney Entities are entitled to retain all of their rights pursuant to the Limited Licenses, the CNTS Rights, the In Three Patent License, and the In Three Patent Rights to continue to use the In Three Patents and to treat the Request for the License Agreement as a license granted on a royalty-free basis, regardless of whether the In Three Patents are sold or transferred and regardless of whether the Production Agreements are assumed, assigned, rejected or otherwise deemed terminated.

### A.    THE LIMITED LICENSES ARE PROTECTED BY §365(n)

15.    Section 365(n) gives a party with intellectual property rights granted in a rejected contract the right to retain its rights as they existed as of the petition date.  The Limited Licenses squarely fall into this protected category and provide the Disney Entities with unambiguous, non-exclusive licenses to use incorporated intellectual property to exploit the Works.  For example, Section 7(b) of the G-Force Agreement provides that:

> To the extent any Company Technology is incorporated into (or is necessary for the use or other exploitation of) the Work or any element thereof at the time of final delivery of the Work (the "Incorporated Company Technology"), Company hereby grants to Producer and its "Affiliates" (as defined below) a perpetual, irrevocable, fully paid-up, royalty-free, worldwide right and license to reproduce, distribute, display, perform, modify and otherwise use and exploit (including by means of making derivative works of

the Incorporated Company Technology as embedded in the Work) all or any portion of the Incorporated Company Technology in connection with displaying, developing, enhancing, marketing, distributing or providing, maintaining, supporting, or otherwise using or exploiting the Work.

Section 6(b) of the Alice in Wonderland Agreement contains this same language, and section 5(b of each of the Tron Agreements contains similar language:

> To the extent any Company IP is incorporated into (or is necessary for the use or other exploitation of) the Work or any element thereof at the time of final delivery of the Work (the "Incorporated Company Technology"), Company hereby grants to Producer and its "Affiliates" (as defined below) a perpetual, irrevocable, fully paid-up, royalty-free, worldwide right and license to reproduce, modify and otherwise use and exploit (including by means of making derivative works of the Company IP as embedded in the Work) all or any portion of such incorporated Company IP in connection with developing, enhancing, marketing, distributing or providing, maintaining, supporting, or otherwise using or exploiting the Work or any products and services incorporating the Work in any form or media (now known or hereafter devised).

Such licenses are standard in the industry, and without them, the Disney Entities would be severely restricted in their ability to display or distribute the Works without risking an infringement challenge.  Presumably, every other producer who has incorporated some element of the In Three Patents in its motion pictures or other works has also been granted similar limited licenses.  Such limited licenses should be recognized and protected by any order approving the Sale Procedures Motion (the "**Sale Procedures Order**") and the Patent Sale (the "**Sale Order**"). The Sale Order should provide that the Patent Sale is subject to, not "free and clear" of, the Limited Licenses and other similar limited licenses.

### B.   THE CNTS RIGHTS ARE ALSO PROTECTED BY §365(n)

16.   All of the Production Agreements include CNTS Rights in substantially similar form protecting the Disney Entities from potentially unauthorized use of the In Three Patents by a third party supplier.  For example, Section 16(a) of the G-Force Agreement provides:

> Company and its Affiliates agree that they will not pursue any claim or cause of action or otherwise assert any Company IP (as defined below) [the In Three Patents] against Producer, its Affiliates or any of their respective customers, agents and distributors (collectively, the "Producer Parties") based on work for any of the Producer Parties by a third party vendor.  Such agreement does not restrict Company's right to pursue a claim or cause of action against a third party for services performed by such third party for the

Producer Parties; provided, however, Company and its Affiliates agree that they will not pursue any claim or cause of action or otherwise assert any Company IP against such third party entity which might interrupt such third party entity's services to or on behalf of the Producer Parties.

The Alice in Wonderland Agreement (at section 6(a)) and Tron Agreements (at section 7(a)) similarly provide:

Company further hereby agrees that it will not seek (1) to challenge, through the courts, administrative governmental bodies, private organizations, or in any manner the rights of Producer to exploit the Work by any means whatsoever, or (2) to thwart, hinder or subvert the intent of the grants and conveyances to Producer herein and/or the collection by Producer of any proceeds relating to the rights conveyed hereunder.

These kinds of provisions are standard in the industry. Presumably, every other producer who has incorporated some element of the In Three Patents in its motion pictures or other works has also been granted similar covenants not to sue.

17.     Pursuant to applicable patent law, such covenants not to sue are generally deemed equivalent to non-exclusive licenses, and therefore are similarly subject to protection under § 365(n). The United States Court of Appeals for the Federal Circuit (which exercises exclusive jurisdiction over patent appeals) and its predecessors have consistently held that "a nonexclusive patent license is equivalent to a covenant not to sue." TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d 1271, 1275 (Fed. Cir. 2009). Because a patent is not an affirmative right to make, use, or sell anything, but instead a limited right to exclude others from making, using or selling the thing patented, "a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee." Id. (quoting Spindelfabrik Suessen–Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1081 (Fed. Cir. 1987)); see also U.S. Philips Corp. v. Int'l Trade Comm'n, 424 F.3d 1179, 1189 (Fed. Cir. 2005) ("A nonexclusive patent license is simply a promise not to sue for infringement."); Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir. 2004) ("This license is, in essence, a licensor's covenant not to sue the licensee.").

18.     The District of Delaware recently followed this established line of patent authority to hold that a covenant not to sue was equivalent to a non-exclusive license that could be retained by election under § 365(n).  See In re Spansion Inc., 2011 WL 3268084 (D. Del. July 28, 2011), appeal docketed, No. 1:10-CV-00252 (3d Cir. Aug. 25, 2011).  Prior to filing for bankruptcy, Spansion litigated a patent infringement action against Apple Computer before the International Trade Commission.  The parties entered into a settlement agreement that provided "Spansion is willing to dismiss the ITC action against Apple, and will not re-file the ITC action or another action related to one or more of the same patents against Apple, in consideration for" Apple's agreement to keep Spansion as a supplier for current products and consider it for future products.  Id. at *1-2.  After executing the settlement agreement and before dismissing the ITC action, Spansion commenced a Chapter 11 case.  In July 2009, Bankruptcy Judge Carey granted Spansion's motion to reject the settlement agreement so it could continue to sue Apple.  Id. at *2. Apple moved pursuant to § 365(n) to retain its rights under the covenant not to sue, which the Bankruptcy Court denied.  On appeal, District Judge Kugler concluded that a covenant not to sue is a license because "the Federal Circuit has 'on numerous occasions explained that a non-exclusive patent license is equivalent to a covenant not to sue.'"  Id. at *6 (quoting TransCore, 563 F.3d at 1275).  The District Court explained that no "special language is required to create a patent license" and that the settlement agreement's "clear language demonstrates that the parties entered into a valid contract by exchanging promises to act or refrain from acting."  Id.[2]

19.     The CNTS Rights and similar rights granted by DDP and its predecessors should be recognized and protected by the Sale Procedures Order and the Sale Order.  Both Orders should expressly provide that the Patent Sale will be subject to, not "free and clear" of, the CNTS Rights.

---

[2] Spansion is currently appealing the District Court decision.  The docket indicates that oral argument, if necessary, is calendared for November 2012.

### C.   THE IN THREE PATENT LICENSE AND IN THREE PATENT RIGHTS ARE ALSO ENTITLED TO PROTECTION UNDER § 365(n)

20.   More than three months before the Petition Date (at the latest), the Disney Entities invoked the In Three Patent Rights in their Request for the granting of the In Three Patent License. Under principles of patent law and the terms of the G-Force Agreement, the In Three Patent License has effectively been granted, and is thus a patent license entitled to the protection of §365(n). To the extent that the In Three Patent License were to be deemed not yet granted, the In Three Patent Rights are nevertheless sufficiently of the same character as the CNTS Rights and the Limited Licenses as to entitle them to the protections of §365(n).

21.   Pursuant to Section 16(b) of the G-Force Agreement, the terms of the grant of the license embodied in the In Three Patent Rights were fully specified therein. The grant became fully effective 30 days after the Request, subject only to determination of the amount of the royalty fees on a most-favored-nation basis. Intervening licenses had been granted on a royalty-free basis, so that one remaining term was already determined by operation of the MFN Clause at the time of the May 18, 2012 Request. Notwithstanding the fact that Disney provided additional consideration for the In Three Patent License in the form of the new work on *Maleficent*, because the G-Force Agreement bound DDP to grant the In Three Patent License, the royalty-free license was thus effective on June 19, 2012.

22.   The execution of the License Agreement was not required to effectuate that grant under the circumstances. As held in Spansion, no "special language is required to create a patent license" and that settlement agreement's "clear language demonstrates that the parties entered into a valid contract by exchanging promises to act or refrain from acting." Spansion at *7; see also, e.g., De Forest Radio Tel. Co. v. United States, 273 U.S. 236, 241 (1927) ("No formal granting of a [patent] license is necessary in order to give it effect. Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license . . .."); . Under the circumstances here, execution

of the formal License Agreement would have merely served to memorialize, in conventional form, the terms of the In Three Patent License to avoid any later disputes.

23.     The Request should be treated as having given rise to a valid, non-exclusive license pursuant to the terms set forth in Section 16(b) of the G-Force Agreement, in light of the MFN Clause. Upon the Disney Entities' exercise of their right to request the In Three Patent License, DDP as In Three's successor was required to grant the IP Patent License within thirty days, having no discretion apart from negotiating the license fee in good faith but bound by the MFN Clause here. No further action by DDP was required under the circumstances to make the license effective, although formal documentation was fully negotiated by the parties prepetition.

24.     As a matter of California contract law, which governs the interpretation of the G-Force Agreement, once the Request was made, DDP should be held to be bound to grant the In Three Patent License, and that license should now be deemed given. An option is considered a unilateral contract that binds the optionor (In Three/DDP) on the exercise of the option by the optionee (the Disney Entities). Stated differently, an option is an irrevocable offer that the optionee can convert into a binding bilateral contract by acceptance of the offer, *i.e.*, exercise of the option. The optionor has a binding duty to keep the option open on the making of the option contract. The optionee has no duty until, and unless, it exercises the option. See Palo Alto Town & Country Village v. BBTC Co., 521 P.2d 1097, 1102-03 (Cal. 1974) (real property lease included option to extend term that was effective upon written notice; as an option is an irrevocable offer which the optionee can convert into a binding bilateral contract by acceptance of the offer, tenant's notice of acceptance by ordinary mail was held to be valid exercise of option, binding landlord to the extended term). Here the Disney Entities' Request bound Debtors to grant the IP Patent License, which grant was effective 30 days thereafter, 115 days before the Petition Date.

25.     The In Three Patent License and, alternatively, should the license itself not be deemed to have been granted, the In Three Patent Rights, granted by DDP and its predecessors should be recognized and protected by the Sale Procedures Order and the Sale Order. Both

Orders should expressly provide that the Patent Sale will be subject to, not "free and clear" of, the In Three Patent License and/or the In Three Patent Rights.

## CONCLUSION

Based on the foregoing, the Disney Entities respectfully object on a limited basis to the Sale Procedures Motion and on a limited and preliminary basis to the Sale Motion, and reserve all rights with respect to both motions. The Disney Entities respectfully request that (a) the order approving the Sale Procedures Motion expressly provide that nothing therein shall be deemed adversely to affect the Disney Entities' Limited Licenses, CNTS Rights, In Three Patent License, and In Three Patent Rights in any manner, and (b) any order approving the Sale Motion expressly provide that that the Patent Sale is subject to the Disney Entities' Limited Licenses, CNTS Rights, In Three Patent License, and In Three Patent Rights, as rights protected under § 365(n).

Dated:    October 30, 2012

POTTER ANDERSON & CORROON LLP

/s/ R. Stephen McNeill
Theresa V. Brown-Edwards (DE Bar No.4225)
R. Stephen McNeill (DE Bar No. 5710)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000

And

ARNOLD & PORTER LLP
Lisa Hill Fenning (California SBN 89238)
Harry E. Garner (California SBN 254942)
777 South Figueroa Street, 44th Floor
Los Angeles, CA  90017
Telephone: (213) 243-4000

**ATTORNEYS FOR
THE DISNEY ENTITIES**