IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DDMG ESTATE, et al., | ) Bankr. No. 12-12568-BLS |
| | ) |
| Debtors. | ) |
| | |
| WALT DISNEY STUDIOS MOTION PICTURE PRODUCTION, et al., | ) ) ) |
| Appellants, | ) ) |
| v. | ) Civ. No. 13-007-SLR |
| | ) |
| DDMG ESTATE, et al., | ) ) |
| Appellees. | ) |

**MEMORANDUM ORDER**

At Wilmington this 1st day of October, 2013, having reviewed the appeal[1] of an order entered by the United States Bankruptcy Court for the District of Delaware (hereafter, "the bankruptcy court") on December 21, 2012 ("the Patent Sale Order"), and the papers filed in connection therewith;

---

[1] Appellants include Walt Disney Studios Motion Picture Production and certain of its affiliates, collectively referred to hereafter as "Disney." Appellees include debtor Digital Domain Media Group ("DDMG") and RealD Inc. ("RealD"), collectively referred to hereafter as "appellees."

IT IS ORDERED that the appeal is denied and the Patent Sale Order (D.I. 28, ex. 3) is affirmed, for the reasons that follow:

1. **Background.** This dispute arises from an agreement entered into between Disney and In Three, Inc. ("In Three") "with respect to [In Three's] services for the theatrical motion picture tentatively entitled 'G-Force'" (hereinafter "the Agreement"). (D.I. 29 at 1) Through the Agreement, In Three was obligated to provide "the 2D to 3D conversion services required by Producer [Disney]." (Id.) In Three also gave Disney the right to use In Three's technology. More specifically, Section 7(b) of the Agreement provided that,

> [to] the extent any Company Technology is incorporated into (or is necessary for the use or other exploitation of) [G-Force] or any element thereof at the time of final delivery of [the film G-Force] (the "Incorporated Company Technology"), Company hereby grants to Producer and its "Affiliates" . . . a perpetual, irrevocable, fully paid-up, royalty-free, worldwide right and license to reproduce, distribute, display, perform, modify and otherwise use and exploit . . . the Incorporated Company Technology in connection with displaying, developing, enhancing, marketing, distributing or providing, maintaining, supporting, or otherwise using or exploiting [the film G-Force].

(D.I. 29 at 7) The "Company Technology" included In Three's "patent or trade secret rights" in any devices, computer graphic models, technologies and processes, and software. (Id.)

2. Section 16, captioned "Covenant Not to Sue," provided that In Three would not pursue "any claim or cause of action or otherwise assert any Company IP[2] . . .

---

[2]Defined in § 16(c) as "patents and patent applications owned, controlled, or acquired by Company or its Affiliates as of the effective date of this Agreement or at any time in the future that relate to or are otherwise associated with the creation, capture, development, distribution, editing, production or display of a motion picture, television show, animation, or other entertainment image or depiction of any kind or

against Producer . . . based on work for [Producer] by a third party vendor." (*Id.* at 10)

Section 16(b) provided that Disney

> may, in its sole discretion, request from Company a license under the Company IP. Within thirty (30) days of receiving such request, Company shall grant to such entity a non-exclusive, transferable (but only to an Affiliate), non-sublicensable, irrevocable, perpetual, worldwide license to make, have made, use, sell, offer for sale, and import any product and perform any method under the Company IP at a fee to be negotiated by the parties in good faith in accordance with then-current industry standards, provided that such fee shall not exceed the lowest license fee provided by Company to any third party. . . . [I]n the event that Company seeks to sell, assign or otherwise transfer any of the Company IP, or its interest in any of the Company IP, to a third party, Company shall provide prompt written notice to Producer not less than sixty (60) days prior to the completion of such sale, assignment, or transfer, and Producer or its Affiliates may thereafter obtain a license under the same terms set forth herein.

(*Id.* at 10) Section 16(d) stated that § 16 "shall survive the expiration or termination of this Agreement." (*Id.* at 11)

3. In 2010, In Three sold all of its assets, including the patents at issue, to DDMG. On September 11, 2012, DDMG and certain of its affiliates filed voluntary petitions for relief under chapter 11 of the bankruptcy code and, within a month, sought approval to sell its assets, including the patents at issue. After DDMG filed its sale motion, Disney objected, claiming to hold broad perpetual license rights to the patents at issue pursuant to § 16[3] of the Agreement, even though Disney has conceded that it neither requested nor executed such a license. In this regard, Disney argues, inter alia,

---

nature, in any form of medium." (*Id.* at 10-11) The "Company IP" shall also be referred to as "the patents at issue."

[3]Disney specifically describes § 7 of the Agreement as containing only "film-specific rights." (D.I. 23 at 5)

3

that it exercised the option under § 16(b) by negotiating with DDMG, thereby acquiring a license to the patents at issue.

4. On December 10, 2012, the bankruptcy court issued a letter opinion overruling Disney's objections, holding that Disney did not hold a broad general license under § 16 of the Agreement. (D.I. 28, ex. 2) On December 14, 2012, DDMG held an auction for the patents at issue, at which RealD was the successful bidder. On December 17, 2012, the bankruptcy court overruled Disney's objections to the sale, denied its request for reconsideration of the letter opinion, and approved the sale of the patents at issue to RealD. On December 21, 2012, the bankruptcy court entered the Patent Sale Order, from which Disney appeals.

5. **Standard of review.** This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third

4

Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. *In re Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup*, 281 F.3d 133, 136 (3d Cir. 2002).

6. **Analysis.** Looking at the four corners of the Agreement, as the court must when undertaking a contract interpretation exercise,[4] the court rejects Disney's claim to the expansive license it seeks. In the first instance, to the extent that Disney characterizes the covenant not to sue contained in § 16(a) as equivalent to a non-exclusive license, Disney's arguments are misplaced for the simple reason that the covenant not to sue at issue is narrow. It protects Disney from lawsuits by In Three based on work performed by third parties for Disney; it does not protect Disney or third parties from a lawsuit by In Three against Disney for unauthorized use of the patents at issue.

7. With respect to the option contained in § 16(b), the language clearly contemplates a two-step process, to wit, a formal request by Disney for such a license followed by a negotiated fee. Especially when read in conjunction with the broad definition of the patents at issue found in § 16(c), it simply strains credulity to think that In Three and Disney bargained to give Disney a virtually unfettered license to the patents at issue, without any obligation on Disney's part to even honor the process contemplated under the Agreement.

8. Having never exercised the option under the Agreement, Disney may not now

---

[4] A court's interpretation of a contract "will give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)).

claim that it has rights to the patents at issue that have survived the sale of such to RealD. The bankruptcy court's well-reasoned opinion contains no errors of law and, therefore, the Patent Sale Order will be affirmed.[5]

_____
United States District Judge

---

[5]The motion to strike filed by DDMG (D.I. 26) is denied as moot.